**TRI–STAR PICTURES, INC., Plaintiff,**

v.

**LEISURE TIME PRODUCTIONS, B.V., Defendant and Third Party Plaintiff,**

v.

**COLUMBIA PICTURES INDUSTRIES, INC., Columbia Pictures Entertainment, Inc., Horizon Pictures G.B., Academy Pictures A.G. and David Bottoms, and Hon. Raya S. Dreben as Executors of the Estate of Samuel Spiegel, Third Party Defendants.**

**88 Civ. 9127 (DNE).**

United States District Court, S.D. New York.

Oct. 15, 1990.

Fried, Frank, Harris, Shriver & Jacobson, New York City (Ira S. Sacks, Cory M. Gray, of counsel), for plaintiff Tri–Star Pictures, Inc. and for third-party defendants Columbia Pictures Industries, Inc. and Columbia Pictures Entertainment, Inc.

Scheichet & Elvin, P.C., New York City (William J. Davis, of counsel), for defendant and third-party plaintiff Leisure Time Productions, B.V.

Weiss, Dawid, Fross, Zelnick & Lehrman, P.C., New York City (Richard Lehv, Alan Zelnick, Glenn Mitchell, of counsel), for third-party defendant Academy Pictures A.G.

## OPINION & ORDER

EDELSTEIN, District Judge:

Tri–Star Pictures, Inc. ("Tri–Star") brought this declaratory judgment action

to resolve a contract dispute between Tri–Star and Leisure Time Productions, B.V. ("Leisure Time") involving the planned release of a motion picture entitled "Return From The River Kwai." Tri–Star also brought a second declaratory judgment action, 88 Civ. 9129 (DNE), which seeks to establish the rights of all the parties involved in the controversy surrounding the planned release of "Return From The River Kwai." The pending motions in both actions will be considered here.

On July 23, 1986, Tri–Star entered into an agreement with Leisure Time to distribute the movie "Return From The River Kwai" in the United States and Canada. Academy Pictures A.G. ("Academy") has alleged trademark rights to the movie "Bridge On The River Kwai" and asserts that the title "Return From The River Kwai" infringes the trademark in the title of its movie. Tri–Star is in the middle of this dispute. If Tri–Star refuses to release "Return From The River Kwai," it will be sued by Leisure Time for breach of contract. If Tri–Star releases the movie, it will be sued by Academy for trademark infringement.

Tri–Star has moved for summary judgment on its claim that Leisure Time breached an express warranty in the 1986 agreement which provided that the film would be delivered to Tri–Star free of all claims against it. Leisure Time has cross-moved for summary judgment claiming that no such warranty exists and, in the alternative, that the warranty was not breached because Academy does not have a valid trademark infringement claim and did not comply with the provisions of the contract relating to such a breach. Leisure Time has moved for summary judgment on Academy's trademark infringement claim. Leisure Time has also moved for summary judgment on its counter-claims against Tri–Star and cross-claims against Columbia Pictures, Inc. and Columbia Pictures Entertainment, Inc. ("Columbia") and Academy for tortious interference of contract based on the false assertion of Academy's trademark claim.

For the reasons stated below, Tri–Star's motion for summary judgment against Leisure Time is granted. Accordingly, Leisure Time's cross motion for summary judgment is denied. Leisure Time's motion for summary judgment on Academy's trademark infringement claim is denied. Leisure Time's motion for summary judgment on its counterclaims against Tri–Star and cross-claims against Columbia and Academy for tortious interference of contract is also denied.

## I. BACKGROUND

There are two series of events relevant to this dispute. The first involves the release of the movie "Bridge On The River Kwai." The second involves the planned release of the movie "Return From The River Kwai."

"Bridge On The River Kwai" was produced in 1956 by Sam Spiegel. The corporate vehicles through which Mr. Spiegel produced "Bridge On The River Kwai" were Horizon–American Pictures, Inc. and Horizon G.B. Ltd. ("Horizon"). Columbia was the distributor.

On April 18, 1956, Albatross Trust, the predecessor of Academy, entered into an agreement ("the 1956 royalty agreement") with Horizon in which Albatross Trust obtained a 25% royalty interest in revenues for the motion picture "Bridge on the River Kwai" in the Western Hemisphere, excluding the United States and Canada. "Bridge On The River Kwai" was released in 1957 and has since been viewed by millions of people in the United States and abroad.

On January 5, 1959, Columbia entered into an agreement ("the January 5, 1959 agreement") with Horizon in which Columbia obtained the rights to "Bridge on the River Kwai" subject to the already existing rights of Albatross Trust created by the 1956 royalty agreement. On February 2, 1959, Columbia reached a separate agreement ("the February 2, 1959 agreement") with Albatross Trust to settle existing claims for overdue royalties. The new agreement included (1) a change in Albatross Trust's royalty rate; (2) the right for

Albatross Trust to receive royalties on United States and Canadian revenues generated by "Bridge on the River Kwai" and (3) a change in the method of computation of Albatross Trust's share of the net proceeds in "Bridge on the River Kwai."

Almost twenty years later, in 1978, Leisure Time registered the title "Return From The River Kwai" with the Motion Picture Association of America ("MPAA") pursuant to a set of MPAA rules which requires its members to register the prospective titles of movies they plan to release. When a prospective title for a movie is filed, the MPAA is then charged with the duty of notifying interested members of the MPAA of the prospective title. Under the MPAA's rules, any member of the MPAA with a complaint then has seven days to protest the title. Leisure Time registered "Return From The River Kwai," but Columbia's protest to the title was not received by the MPAA until after the seven day time limit and was therefore not considered.

In July, 1986, Tri–Star and Leisure Time entered into an agreement ("the 1986 distribution agreement") whereby Leisure Time granted Tri–Star exclusive distribution rights for the movie "Return From The River Kwai" in the United States and Canada. Unbeknownst to Tri–Star, before the 1986 agreement, a dispute had arisen regarding the title "Return From the River Kwai." Academy and Columbia had communicated to Leisure Time their position that as a result of the widespread exposure received by the motion picture "Bridge On The River Kwai," the title and the geographic term "River Kwai" had attained secondary meaning and were therefore entitled to trademark protection.

On December 17, 1987, after the execution of the 1986 agreement, Tri–Star and Columbia Pictures merged and became "sister" companies as wholly owned subsidiaries of Columbia Pictures Entertainment, Inc.. Since that time, Columbia has not asserted any of the trademark claims it believes it has against "Return From The River Kwai."

Upon learning of the title dispute, Tri–Star requested that Leisure Time change the name of "Return From The River Kwai" to avoid potential liability. In early November 1988, Leisure Time offered to change the title to "March From The River Kwai" and to add a disclaimer disassociating the motion picture from "Bridge On The River Kwai." This offer was not acceptable to Academy. By a letter dated November 17, 1988, Academy advised Tri–Star that any use of the name "River Kwai" would be met with a lawsuit to protect Academy's rights in the title.

On December 5, 1988, Tri–Star wrote Leisure Time notifying them of Academy's trademark infringement claim. In the letter, Tri–Star stated that because of Academy's claim, Tri–Star considered Leisure Time in breach of its warranty to deliver the movie free from claims against it and therefore considered itself free to terminate the agreement. In response, Leisure Time threatened to sue for breach of contract if Tri–Star terminated the agreement.

On December 27, 1988, Tri–Star then filed the instant declaratory judgment action, 88 Civ. 9127 (DNE), and the companion declaratory judgment action, 88 Civ. 9129 (DNE). Tri–Star moved for summary judgment in the first action claiming that Leisure Time had breached its warranty in the 1986 distribution agreement that the movie "Return From The River Kwai" would be delivered free of all claims against it. Leisure Time cross-moved for summary judgment against Tri–Star, but also (1) moved for summary judgment on its claims for tortious interference of contract against Columbia and Academy, and (2) moved for summary judgment on Academy's trademark infringement claim. Columbia moved pursuant to Federal Rule of Civil Procedure 11 ("Rule 11") for the imposition of sanctions on Leisure Time for Leisure Time's motion for summary judgment on its claim against Columbia for tortious interference of contract. Academy also moved pursuant to Rule 11 for the imposition of sanctions on Leisure Time for both Leisure Time's motion for summary judgment on its claim against Academy for tortious interference of contract and Lei-

sure Time's motion for summary judgment on Academy's. claim for trademark infringement. After this Court held a hearing on the Rule 11 motions, the parties were able to settle the issue of sanctions.

## II. DISCUSSION

A party moving for summary judgment must establish "that there is no genuine issue as to any material fact" and that it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of establishing the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The non-moving party then has the burden of coming forward with specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). In meeting this burden, the non-moving party may not rely on speculation and conjecture as to the true nature of the facts. *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). To avoid summary judgment, there must be enough evidence in favor of the non-moving party's case for a rational trier of fact to return a verdict in the non-moving party's favor. *National Union Fire Ins. Co. v. Walton Ins. Ltd.*, 696 F.Supp. 897, 900 (S.D.N.Y. 1988).

The material facts which need to be examined in order to determine whether summary judgment is appropriate with respect to Tri–Star and Leisure Time's cross-motions for summary judgment are: (1) whether there was a warranty that protected against the assertion of trademark infringement claims; (2) whether there was a breach of such a warranty; and (3) whether the parties complied with the provisions of the contract relating to such a breach. As discussed below, Tri–Star has established that there are no genuine issues of materi-

al fact and that it is entitled to judgment as a matter of law. Tri–Star has shown that there was a warranty protecting against the assertion of trademark infringement claims, that the warranty was breached, and that Tri–Star complied with the provisions of the contract relating to such a breach. Leisure Time has relied solely on speculation and conjecture to contest Tri–Star's claims and has not produced sufficient evidence for a rational trier of fact to return a verdict in its favor.

With respect to Leisure Time's motion for summary judgment on Academy's trademark infringement claim, a number of genuine issues of material fact exist regarding whether "Bridge On The River Kwai" has attained secondary meaning and whether the title "Return From The River Kwai" is confusingly similar. Leisure Time's motion for summary judgment on Academy's trademark infringement claim is therefore denied. As for Leisure Time's tortious interference of contract claims against Columbia and Academy, since Tri–Star has not breached its contract with Leisure Time, Leisure Time cannot state a claim for tortious interference of contract as a matter of law. Accordingly, Leisure Time's motion for summary judgment on its claims for tortious interference of contract is denied.

### A. Warranty

The 1986 distribution agreement consists of a "Term Sheet" and a rider including "Exhibits." Tri–Star asserts that Leisure Time represented and warranted under ¶ 9(a)(2) of Exhibit "A" to the 1986 Agreement ("¶ 9(a)(2) of Exhibit "A") that "Return from the River Kwai" would be provided for distribution free from "claims, liens, encumbrances or rights of any nature ... which can or will impair or interfere" with Tri–Star's distribution of the film.[1]

---

**1.** Paragraph 9(a)(2) of Exhibit "A" provides: "There are, and will be, no claims, liens, encumbrances or rights of any nature in or to the picture or any part thereof which can or will impair or interfere with the rights of Tri–Star hereunder; and the picture and each and every part thereof, including the sound

and music synchronized therewith, and the exercise by Tri–Star of any right hereunder with respect thereto, will not violate or infringe upon the trademark, trade name, copyright, patent, literary, dramatic, music, artistic, personal, civil or property rights of any

Paragraph 9(a)(2) of Exhibit "A" further warrants that the film will not "infringe upon the trademark" of another party. According to Tri–Star, ¶ 9(a)(2) of Exhibit "A" extends not only to claims which have already impaired or interfered with Tri–Star rights, but also to claims which prospectively could impair or interfere with Tri–Star's rights. Tri–Star maintains that Academy's claim that the title "Return From The River Kwai" infringes its trademark rights in the title "Bridge On The River Kwai" constitutes a breach of Leisure Time's warranty in ¶ 9(a)(2) of Exhibit "A."

In response, Leisure Time contends that the distribution agreement does not provide for ¶ 9(a)(2) of Exhibit "A" to be the governing representation and warranty paragraph. Rather, Leisure Time contends that ¶ 12 of the Term Sheet of the 1986 distribution agreement ("¶ 12 of the Term Sheet") provides Leisure Time's representations and warranties and that they are different from those contained in ¶ 9(a)(2) of Exhibit "A." Under ¶ 12 of the Term Sheet, Leisure Time warrants that it owns and controls the rights being granted under the agreement and that "all such rights are hereby granted ... free and clear of all liens, claims and encumbrances." [2] According to Leisure Time, the rights granted to Tri–Star to which the warranty in ¶ 12 of the Term Sheet applies are set forth in ¶ 2 of the Term Sheet and do not include any rights with respect to the movie's title.[3] Unlike the prospective warranties included

in ¶ 9(a)(2) of Exhibit "A," Leisure Time argues that ¶ 12 of the Term Sheet warrants only that the rights granted at the time the contract was executed are free and clear of all liens, claims, and encumbrances.

Because of the differences between ¶ 12 of the Term Sheet and ¶ 9(a)(2) of Exhibit "A," Leisure Time argues that the two provisions are inconsistent. In the event of an inconsistency between the Term Sheet and the Exhibits, ¶ 13 of the Term Sheet states that the provisions in the Term Sheet will prevail over the provisions in the Exhibits.[4] Leisure Time therefore argues that ¶ 12 of the Term Sheet contains the controlling warranties. In the alternative, Leisure Time argues that the differences between the two paragraphs render the contract inherently ambiguous and therefore presents a genuine issue of material fact.

When the terms of a contract are clear and unambiguous, the court will not look beyond the "four corners" of the document to discern what the parties meant. *Bellefonte Re Ins. Co. v. Argonaut Insurance Co.*, 581 S.Supp. 241, 243 (S.D.N.Y.1984); *United States v. Wallace & Wallace Fuel Oil Co., Inc.*, 540 F.Supp. 419, 426 (S.D.N.Y.1982). A court will only consider parol evidence when interpreting a contract if a party establishes that one or more of the relevant terms of the contract is ambiguous. *Eskimo Pie Corp. v. White Lawn Dairies, Inc.*, 284 F.Supp. 987, 993 (S.D.N.Y.1968). The question of whether an ambi-

---

party, or constitute a violation of any law or administrative rule or regulation."

2. Paragraph 12 of the Term Sheet provides:

"Producer represents and warrants that it has the right and authority to enter into this Agreement, that it owns and controls all the rights granted and agreed to be granted to [Tri–Star] and that all such rights are hereby granted to [Tri–Star] free and clear of all liens, claims and encumbrances."

3. Paragraph 2 of the Term Sheet provides in relevant part:

"Producer hereby grants to [Tri–Star] the sole and exclusive theatrical and non-theatrical rights in and to the picture (including without limitation the right to advertise and publicize the Picture in any and all media) in

perpetuity ... 'Nontheatrical' includes, without limitation, distribution of the Picture to aircraft and ships at sea flying the flag of or customarily serviced from the Territory, hotels, motels, etc..... [Tri–Star] shall have the right to cut and edit the Picture (i) for censorship requirements or to avoid legal liability; and/or (ii) if [Tri–Star] accepts delivery of the Picture. . . ."

4. Paragraph 13 of the Term Sheet provides in relevant part:

"[T]he balance of the terms and conditions applicable hereto ... shall be in accordance with [Tri–Star's] standard terms attached hereto as Exhibits 'A' and 'B'.... In the event of any inconsistency between this Agreement and said Exhibits, the terms of this Agreement shall prevail."

guity exists is a question of law to be decided by the court. *Tokio Marine & Fire Ins. v. McDonnell Douglas Corp.,* 617 F.2d 936, 940 (2d Cir.1980). A term is considered ambiguous when it is capable of more than one meaning when viewed by "a reasonably intelligent person." *Eskimo Pie Corp., supra,* 284 F.Supp. at 993. In the event that a party cannot establish such an ambiguity, interpretation of the contract is a question of law appropriate for summary judgment and therefore no trial is necessary to determine the contract's legal effect. *Leslie Fay, Inc. v. Rich,* 478 F.Supp. 1109, 1113–14 (S.D.N.Y. 1979).

■ The issue presented to this Court is whether ¶ 9(a)(2) of Exhibit "A" and ¶ 12 of the Term Sheet are inconsistent. There are no ambiguous terms that need to be interpreted. Rather, the question of whether ¶ 9(a)(2) of Exhibit "A" and ¶ 12 of the Term Sheet are inconsistent can be resolved by examining the plain language of the two warranty paragraphs. As a result, this issue of interpretation presents a question of law, not of fact, and does not require a trial.

Leisure Time's argument that ¶ 9(a)(2) and ¶ 12 are inconsistent is unavailing. Paragraph 9(a)(2) of Exhibit "A" and ¶ 12 of the Term Sheet are consistent because the warranties in ¶ 9(a)(2) of Exhibit "A" add to the warranties in ¶ 12 of the Term Sheet. Under ¶ 12 of the Term Sheet, Leisure Time guaranties that it is giving Tri–Star complete ownership and control of "Return From The River Kwai." Paragraph 9(a)(2) of Exhibit "A" adds to this warranty of ownership and control by guarantying both that the ownership and control will not be impaired by the claims, liens, encumbrances or rights of third parties and that the ownership and control will not be impaired by violations of law or administrative rule. Moreover, whereas ¶ 12 of the Term Sheet guaranties Leisure Time's ownership and control as of the date the contract was executed, ¶ 9(a)(2) of Exhibit "A" guaranties not only that Leisure Time's ownership and control will not be encumbered by third party claims or viola-tions of law existing as of the date the contract was executed, but also guaranties that such ownership and control will not be encumbered by any future claims or violations of law.

In sum, ¶ 9(a)(2) of Exhibit "A" and ¶ 12 of the Term Sheet are consistent. Leisure Time is therefore bound by the warranties in both paragraphs. Paragraph 9(a)(2) of Exhibit "A" warrants against any claims that might impair Tri–Star's rights and specifically lists third party trademark claims. The next issue that must be determined is whether Academy's trademark infringement claim impairs Tri–Star's rights and therefore constitutes a breach of Leisure Time's warranty in ¶ 9(a)(2) of Exhibit "A."

### B. Breach of Warranty

Tri–Star contends that Leisure Time breached its warranty in ¶ 9(a)(2) of Exhibit "A" because Academy's trademark infringement claim, if successful, could impair Tri–Star's rights by enjoining the release of the film under its present title and by subjecting Tri–Star to substantial money damages. Leisure Time asserts that the warranty in ¶ 9(a)(2) of Exhibit "A" has not been breached because Academy does not have a valid trademark infringement claim. Leisure Time has offered a number of arguments to support this assertion: (1) Academy does not have a sufficient interest in "Bridge On The River Kwai" to bring a trademark infringement claim; (2) Academy, through its predecessor Albatross Trust, agreed not to sue Columbia or its affiliates; (3) Academy's claim is barred by the rules of the MPAA; and (4) Leisure Time is entitled to summary judgment on Academy's trademark infringement claim. Each of these arguments will be examined in turn.

### 1. Academy's interest in "Bridge On The River Kwai"

■ Leisure Time asserts that Academy does not have a sufficient interest in "Bridge On The River Kwai" to bring a trademark infringement claim. Leisure Time makes two arguments to support this assertion: (1) the contract conferring Acad-

emy rights to "Bridge On The River Kwai" in Canada and the United States lacked consideration; and (2) Academy's royalty interest in the movie is insufficient to confer Lanham Act standing.

Leisure Time argues that the February 2, 1959, agreement between Columbia and Albatross Trust was unsupported by consideration. As discussed earlier, Academy, through its predecessor Albatross Trust, obtained a 25% royalty interest to "Bridge On The River Kwai" from Horizon in the 1956 royalty agreement. Columbia obtained rights to the movie from Horizon in the January 5, 1959 agreement subject to Albatross Trust's royalty interest created in the 1956 royalty agreement. In the February 2, 1959 agreement, Columbia agreed' with Albatross Trust to expand Albatross Trust's rights to receive royalties from the United States and Canada in order to settle its existing claims for overdue royalties. Albatross Trust, now Academy, has been receiving royalties on revenues in the United States under this contract for the past 31 years.

A contract is supported by consideration if there is a bargained for exchange of promises. *Banque Arabe et Int'l D'Investissement v. Bulk Oil, Inc.*, 726 F.Supp. 1411, 1419 (S.D.N.Y.1989). A promise is bargained for "if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." Restatement (Second) of Contracts § 71 (1979). Where parties to a contract are satisfied with their bargain, a third party "may not challenge the contract's validity on the basis of alleged insufficient consideration." *OPE Shipping, Ltd. v. Allstate Ins. Co., Inc.*, 687 F.2d 639, 643 (2d Cir.), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983).

Neither Columbia or Academy has challenged the sufficiency of consideration in the February 2, 1959 agreement between them. The parties satisfaction with the agreement is evidenced by the fact that Academy has been receiving revenues from Columbia pursuant to the agreement for the past 31 years. Leisure Time, as a third party, therefore has no legal basis to challenge the sufficiency of consideration supporting the agreement. Even if Leisure Time had standing to challenge the agreement, the agreement was clearly supported by consideration. Columbia sought to settle Albatross Trust's existing claims for royalty payments and, in order to do so, promised Albatross Trust an expanded region from which to receive royalties. In turn, Albatross Trust promised to drop its royalty claims in exchange for the expanded geographical region from which to receive royalties.

Leisure Time next contends that Academy's royalty interest in "Bridge On The River Kwai" is insufficient to bring a trademark infringement claim because Columbia owns all the property rights to the film. Essentially, Leisure Time argues that Academy does not have Lanham Act standing. Academy's royalty interest in the revenues from the movie, however, is sufficient to confer standing under § 43(a) of the Lanham Act.

Any "commercial party" which "has a reasonable interest to be protected" has standing under § 43(a) of the Lanham act. *Nat'l Assoc. of Pharmaceutical Mfr. v. Ayerst Laboratories*, 850 F.2d 904, 915 (2d Cir.1988). More specifically, a royalty interest, stripped of all other property rights, is sufficient to confer standing under § 43(a) of the Lanham. *PPX Enterprises v. Audiofidelity, Inc.*, 746 F.2d 120, 125 (2d Cir.1984). Academy's royalty interest in "Bridge On The River Kwai" was created through its predecessor Albatross Trust in the 1956 royalty agreement with Horizon and expanded in the February 2 1959 agreement with Columbia. Academy therefore has a royalty interest in "Bridge On The River Kwai;" this interest is sufficient to give Academy standing under § 43(a) of the Lanham Act.

### 2. Albatross Trust's Agreement Not To Sue Columbia

Paragraphs 15 and 16 of the February 2, 1959 agreement between Albatross Trust and Columbia contain Albatross Trust's covenants not to sue Columbia or its affiliates for certain claims. Under

¶ 15, Albatross Trust agreed that it would not sue Columbia or its affiliates for any claims arising out of Columbia's distribution of "Bridge On The River Kwai" in the Western Hemisphere other than for claims arising out of its rights under the contract.[5] Under ¶ 16, Albatross Trust promised it would not sue Columbia or its affiliates asserting a claim to "Bridge On The River Kwai" other than a claim based on its royalty interest.[6] Leisure Time argues that Academy, through Albatross Trust, agreed in ¶¶ 15 and 16 of the February 2, 1959 agreement not to sue Columbia or any of its affiliates, including Tri–Star, for any claims relating to "Bridge On The River Kwai." Leisure Time's proposed interpretation, however, is too broad.

Essentially, Albatross Trust agreed not to sue Columbia or its affiliates for any claims arising from its distribution of the movie "Bridge On The River Kwai" or for any claims to the movie except for claims arising from its royalty interest under the contract. Academy, however, is not suing here on a claim arising out of the distribution of "Bridge On The River Kwai," nor is Academy asserting a claim to the movie. Rather, Academy is suing to prevent the distribution of another movie with a title confusingly similar to "Bridge On The River Kwai." Academy has brought this lawsuit to protect its royalty interest. Academy's trademark infringement claim is therefore excepted from both ¶¶ 15 and 16 because it is a claim arising from its right to receive royalties under the February 2, 1959 agreement. Thus, Academy is not precluded from bringing its trademark in-

fringement claim against Tri–Star, Columbia's affiliate since 1987.

■ Furthermore, nothing in the covenants prevent Academy from suing Leisure Time. The covenants in ¶¶ 15 and 16 run to Columbia and its subsidiaries and affiliates, and do not apply to any third parties. Therefore, even if the covenants barred Academy from suing Tri–Star, they would not bar Academy from suing Leisure Time under the Lanham Act to enjoin the release of the movie "Return From The River Kwai." Such a suit by Academy against Leisure Time could clearly impair or interfere with Tri–Star's distribution rights under the 1986 distribution agreement and would therefore constitute a breach of ¶ 9(a)(2) of Exhibit "A."

### 3. Failure To Protest Before the MPAA

■ As discussed earlier, Leisure Time registered the title "Return From The River Kwai" with the MPAA. Columbia filed a protest to the title with the MPAA claiming that it was confusingly similar to "Bridge On The River Kwai." The protest was not considered by the MPAA, however, because it was received a day after the MPAA's seven day deadline.

Leisure Time contends that Columbia's failure to file its objection with the MPAA within the proper time frame should preclude Academy from raising a Lanham Act claim in federal court. It is doubtful, however, whether Columbia's procedural error with the MPAA could preclude it from bringing a Lanham Act claim in federal court, let alone preclude Academy from

---

**5.** Paragraph 15 provides:

"You agree that you do not have and shall not have ground or right to challenge our due performance of all of our obligations relating to the distribution and exploitation of the Picture in the Western Hemisphere ... you hereby generally release and discharge us, our successors and assigns, of and from all manners of actions, causes of actions, suits, liabilities, claims and demands whatever, in law or in equity, which you have, can or may hereafter have by reason of any contract, matter, cause or thing whatsoever, based upon or related to or in connection with the distribution thereof in the Western Hemisphere ... there being excluded from the foregoing only

our obligations and your rights under the terms of this agreement."

**6.** Paragraph 16 provides:

"You agree that you will forever refrain from instituting any action or proceeding of any kind or any nature against us, or our subsidiaries or affiliates ... asserting or based upon a claim of any nature or any right or interest in the Picture for the western hemisphere or the proceeds, heretofore or hereafter derived therefrom, or from any rights therein for the western hemisphere ... there being excluded from the foregoing, however, only such right as you may hereafter have with respect to the sums payable to you under the terms of this agreement."

bringing such a claim. *Cf. John Lemmon Films, Inc. v. Atlantic Releasing Corp.,* 617 F.Supp. 992, 994–95 (D.C.N.C.1985) (plaintiff's failure to file an objection with the MPAA did not preclude its preliminary injunction action under the Lanham Act to prevent defendant's distribution of a film with a title confusingly similar to plaintiff's service mark). Academy is not a member of the MPAA, did not receive notice of the intended registration of the title "Return From The River Kwai," and had no opportunity to object to Leisure Time's registration of that title with the MPAA. Academy is therefore not barred from bringing a Lanham Act claim by Columbia's failure to file a timely protest with the MPAA.

### 4. Leisure Time's Motion For Summary Judgment On Academy's Trademark Infringement Claim

Leisure Time argues that it is entitled to summary judgment against Academy on Academy's trademark infringement claim. Academy contends that the movie title "Return From The River Kwai" is confusingly similar to its movie title "Bridge On The River Kwai," which has attained secondary meaning. If Leisure Time's motion were granted, Leisure Time argues that Academy would have no claim that could impair Tri–Star's rights and that Leisure Time therefore would not have breached the warranty in ¶ 9(a)(2) of Exhibit "A." Leisure Time's motion for summary judgment, however, must be denied because there are genuine issues of material fact concerning Academy's claim.

Section 43(a) of the Lanham Act creates civil liability for any person who "uses a false designation of origin" or "any false description or representation" in connection with any goods or services the person places into commerce. 15 U.S.C. § 1125(a) (1982). For a film's title to be protected under § 43(a), the title must have attained some "secondary meaning." *Orion Pictures Co., Inc. v. Dell Publishing Co., Inc.,* 471 F.Supp. 392, at 395 (S.D.N.Y.1979). Secondary meaning in a title occurs when the title is sufficiently well known that consumers associate it with a particular author's work. *Id.* Where the title of a movie or a book has acquired secondary

meaning, "the holder of the rights to that title may prevent the use of the same title or a confusingly similar title by other authors." *Rogers v. Grimaldi,* 875 F.2d 994, 998 (2d Cir.1989).

Interpreting the Lanham Act broadly to protect movie titles invokes first amendment concerns because movie titles are a form of artistic expression. *Id.* at 997–98. Nonetheless, laws such as the Lanham Act seek to foster free expression by protecting author's works. *Id.* at 998. In order to balance these concerns, when examining a Lanham Act claim involving artistic works, a court must decide "whether the public interest in avoiding consumer confusion outweighs the public interest in free expression." *Id.* at 999.

In its motion for summary judgment on Academy's Lanham Act claim, Leisure Time relies exclusively on the Second Circuit's decision in *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir.1989). Leisure Time argues that *Rogers* established a First Amendment privilege for film titles that have artistic relevance to the subject matter of the film. Leisure Time, however, asks this Court to interpret the privilege established in *Rogers* too broadly.

In *Rogers,* Ginger Rogers, the famous star of Hollywood musicals, sued under the Lanham Act to prevent the use of the title "Ginger and Fred" for a fictional movie that obliquely related to Ginger Rogers and Fred Astaire. *Id.* at 996. Rogers claimed that the movie violated the Lanham Act because it created the false impression that the movie was either about her or sponsored by her. *Id.* at 997. The Court stated that in the specific instance of an allegedly misleading title using a celebrity's name, the balance of the public interest in avoiding consumer confusion and the public interest in free expression will normally not support application of the Lanham Act "unless the title has no artistic relevance to the underlying work whatsoever, or if it has some artistic relevance, unless the title explicitly misleads as to the source or the content of the work." *Id.* at 999. In a footnote to the sentence containing this holding, the Court went on to state that this limiting construction of the Lanham Act "would not apply to misleading titles

that are confusingly similar to other titles." *Id.* at 999 n. 5. The Court reasoned that "[t]he public interest in sparing consumers this type of confusion outweighs the slight public interest in permitting [the] use of such titles." *Id.*

Thus, despite Leisure Time's reliance on *Rogers,* the Court's holding in that case only applies to situations where a celebrity's name is used in a title and is therefore not applicable to Academy's claim here that the titles "Bridge On The River Kwai" and "Return From The River Kwai" are confusingly similar. Indeed, the footnote to the Court's holding in *Rogers* specifically states that it does not apply to claims, like Academy's, of confusingly similar titles. Accordingly, Leisure Time's reliance on *Rogers* is misplaced and their motion for summary judgment on Academy's Lanham Act claim must be denied so that a complete factual record can be established to demonstrate both whether "Bridge On The River Kwai" has attained secondary meaning and whether a reasonable consumer would find the title "Bridge On The River Kwai" confusingly similar to "Return From The River Kwai."

The existence of a genuine issue of material fact in Academy's trademark infringement claim is more than sufficient to constitute a "claim" under ¶ 9(a)(2) of Exhibit "A." The existence of Academy's claim threatens to interfere with Tri–Star's rights to distribute "Return From The River Kwai." Leisure Time has therefore breached its warranty to Tri–Star under ¶ 9(a)(2) of Exhibit "A."

### C. Provisions of the Contract Relating to Breach

■ As a result of Leisure Time's breach of ¶ 9(a)(2) of Exhibit "A," Tri–Star argues that it should be allowed to terminate the 1986 distribution agreement pursuant to the provisions relating to breach in the agreement. Paragraph 7(a)(2) of Exhibit "A" to the agreement provides that an event of default includes any breach of warranty "which materially affect Tri–Star's rights." [7] Consequently, a breach of ¶ 9(a)(2) of Exhibit "A" constitutes an event of default. Paragraph 7(e) of Exhibit "A" to the agreement goes on to provide that if an event of default occurs and it is not cured within ten days after notice from Tri–Star specifying such event of default, Tri–Star shall have the right any time thereafter to terminate the agreement.[8] Tri–Star provided such notice to Leisure Time in a December 5, 1988 letter which stated that Academy threatened to sue for any title containing "River Kwai," and that such a claim breached Leisure Time's warranty in ¶ 9(a)(2) of Exhibit "A." Leisure Time did not cure the default. Instead, it threatened to sue Tri–Star.

Leisure Time argues that Tri–Star's notice was defective because it referred to ¶ 9(a)(2) of Exhibit "A," rather than ¶ 12 of the Term Sheet. This argument is unavailing for two reasons. First, as previously discussed, ¶ 9(a)(2) of Exhibit "A" was the appropriate warranty for Tri–Star to mention. Second, ¶ 7(e) of Exhibit "A" states that Tri–Star must provide notice of the "event of default" and Tri–Star provided such notice by specifically referring to Academy's threatened lawsuit. Thus, Tri–Star has completely satisfied its obligations under the provisions in the 1986 distribution agreement regarding Leisure Time's breach of warranty. That agreement required Leisure Time to deliver the motion picture free of all claims against it. Because Leisure Time did not do so, Tri–Star is entitled to terminate the agreement.

### D. Leisure Time's Tortious Interference Claims

■ Leisure Time argues in its motions for summary judgment on its tortious in-

7. Paragraph 7(a)(2) provides that an event of default shall include:
   "Any breach or default by Company [Leisure Time] of any representation, warranty, or other term or provision of this Agreement, which materially affects Tri–Star's rights hereunder...."

8. Paragraph 7(e) provides:

   "If, at any time an Event of Default shall occur and Company [Leisure Time] fails to cure same within ten (10) days after notice from Tri–Star specifying such Event of Default, then Tri–Star shall have the right, at any time thereafter, to terminate this Agreement by notice in writing to such effect to Company [Leisure Time]...."

**1254**

terference of contract claims against Columbia and Academy that they have acted with "unclean hands" and therefore have tortiously interfered with Leisure Time's 1986 distribution agreement with Tri–Star. Leisure Time relies on *Precision Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945), where the Supreme Court denied equitable relief to a plaintiff under the "clean hands" doctrine. Unclean hands, however, is not a cause of action; it is an equitable defense to equitable claims.

One of the essential elements of a claim for tortious interference of contract is that the alleged tort-feasor caused a third party to breach its contract with the plaintiff. *Universal Studios v. Nintendo Co., Ltd.*, 797 F.2d 70, 75 (2d Cir.), *cert. denied*, 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986); *Strobel v. New York Mercantile Exchange*, 561 F.Supp. 379, 386 (S.D.N.Y. 1983). Thus, in this case, Tri–Star would have had to breach its contract with Leisure Time for Leisure Time to have valid tortious interference of contract claims against Columbia and Academy. Because Tri–Star did not breach its contract with Tri–Star, Leisure Time's claims are deficient as a matter of law. Accordingly, Leisure Time's motion for summary judgment on its claims for tortious interference of contract must be denied.

### III. CONCLUSION

For the reasons stated above, Tri–Star's motion for summary judgment is granted. Accordingly, Leisure Time's cross-motion for summary judgment is denied. Leisure Time's motion for summary judgment on Academy's trademark infringement claim is denied. Leisure Time's motion for summary judgment on its claims for tortious interference of contract against Columbia and Academy is also denied.

SO ORDERED.