**TRI–STAR PICTURES, INC.,**
Plaintiff–Appellee,

v.

**LEISURE TIME PRODUCTIONS,**
B.V., Defendant–Appellant.

**LEISURE TIME PRODUCTIONS, B.V.,**
Third–Party Plaintiff–Appellant,

v.

**COLUMBIA PICTURES INDUSTRIES, INC. and Columbia Pictures Entertainment, Inc., Third–Party–Defendants–Appellees,**

Horizon Pictures, G.B.; Academy Pictures, A.G.; David N. Bottoms and Hon. Raya S. Dreben, as Executors of the Estate of Samuel Speigel, Third–Party Defendants.

**No. 375, Docket 93–7361.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1993.
Decided Feb. 17, 1994.

after Sotelo left Peru.

Jay Cohen, New York, NY (Robert E. Goudie, Jr., Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, of counsel), for Defendant–Third–Party–Plaintiff–Appellant.

Ira S. Sacks, New York, NY (Jocelyn Lee Jacobson, Fried, Frank, Harris, Shriver & Jacobson, New York, NY, of counsel), for Plaintiff–Appellee and Third–Party–Defendants–Appellees.

Before: MINER and ALTIMARI, Circuit Judges, and ELFVIN, District Judge.*

MINER, Circuit Judge:

Defendant-third-party-plaintiff-appellant Leisure Time Productions, B.V. ("Leisure Time") appeals from a summary judgment entered on March 24, 1993 in the United States District Court for the Southern District of New York (Edelstein, *J.*) in favor of plaintiff-appellee Tri–Star Pictures, Inc. ("Tri–Star") in an action brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 & 2202, declaring the contract for distribution of Leisure Time's motion picture

---

* Honorable John T. Elfvin of the United States District Court for the Western District of New York, sitting by designation.

terminated, and dismissing Leisure Time's counterclaims for breach of contract and unfair competition. The district court also dismissed third-party claims by Leisure Time against Columbia Pictures Industries, Inc. ("CPII") and Columbia Pictures Entertainment, Inc. ("CPEI") to recover for unfair competition. Tri–Star brought the action to declare terminated a distribution agreement ("Distribution Agreement") it had entered into with Leisure Time for the distribution of a motion picture produced by Leisure Time. On appeal, Leisure Time primarily contends that the district court erred in granting summary judgment because it failed to consider certain provisions of the distribution agreement in determining whether genuine issues of material fact were presented. For the reasons that follow, we affirm.

## BACKGROUND

The titles of two motion pictures, "The Bridge on the River Kwai" ("*Bridge*") and "Return from the River Kwai" ("*Return*"), give rise to the conflict among the parties in this case. *Bridge* was produced in 1956 by the late Sam Spiegel through two corporations he controlled, Horizon–American Pictures, Inc. and Horizon G.B. Ltd. ("Horizon"). Academy Pictures, A.G. ("Academy") is the successor in interest to Albatross Trust, which received from Horizon in 1956 the right to certain royalty payments in connection with the distribution of *Bridge*. In 1959, CPII acquired the copyright to *Bridge*, subject to Academy's existing royalty interest.[1] Later that year, CPII and Academy entered into an agreement to resolve claims regarding royalty payments due Academy. As a result, Academy's royalty rates were increased and its rights extended to include revenue from the United States and Canada. Academy also agreed not to sue CPII for claims relating to *Bridge* except for claims arising out of its rights under the agreement, including royalty payments.

Leisure Time (through its predecessor in interest, Screenlife Establishment) acquired in 1978 all motion picture rights in a book

entitled *Return from the River Kwai*. In a 1987 letter to Kurt Unger, the producer of *Return*, Hollywood agent Paul Kohner indicated that the rights to *Return* had first been offered to Spiegel. According to Kohner, Spiegel declined the opportunity to purchase the motion picture rights to *Return*. Albert Heit, the long-time attorney for Spiegel, Horizon and Academy, testified during his deposition in this action that, while he and Spiegel had discussed the book and its legal ramifications, they never discussed a motion picture based on the book and Spiegel never informed him that he had been offered the motion picture rights. Heit also testified that Spiegel ordinarily would have informed him of such an offer.

The acquisition of the motion picture rights in *Return* was publicized in the Hollywood trade press. Leisure Time also registered the title *Return* with the Motion Picture Association of America ("MPAA"). This registration was published in the MPAA's daily title registration listing service, which was mailed to all subscribers of the service. Both CPII and Horizon subscribed to this service. The MPAA rules then in effect enabled any member to protest a newly registered title within seven days of receiving notice of the registration. CPII, a member of the MPAA, protested the registration of *Return* on the ground of harmful similarity. The protest was not considered by the MPAA because it was received a few days late, but it was published by the MPAA in its daily listing service. After registering the title, Leisure Time commenced pre-production activities. According to Unger, Leisure Time spent approximately two million dollars between 1978 and 1988 in various pre-production activities such as selecting actors, directors, screenwriters and distributors, and arranging for financing and film sites.

In July of 1986, Tri–Star and Leisure Time entered into the Distribution Agreement, under which Leisure Time promised to deliver *Return* to Tri–Star and, in turn, Tri–Star obligated itself to distribute *Return* in the United States and Canada. Leisure Time

---

1. In December of 1987, Tri–Star and CPII merged and became "sister companies" of CPEI, a third-party-defendant-appellee. CPEI was formed to oversee the operations of Tri–Star and CPII.

represented and warranted that it would provide *Return* for distribution free of any claims that "can or will" impair or interfere with the rights of Tri–Star. The Distribution Agreement also provided for termination upon Leisure Time's breach of any warranty which "materially affect[ed]" the rights of Tri–Star thereunder. Additionally, the Distribution Agreement provided that Leisure Time would indemnify Tri–Star for any claims caused by a breach of the Distribution Agreement and also required Leisure Time to procure errors and omissions insurance ("E & O" insurance) to protect against trademark claims.

Early in June of 1987, Ronald N. Jacobi, then Senior Vice President and General Counsel of CPII, telephoned Heit to advise him that Leisure Time was planning to produce a motion picture entitled "Return from the River Kwai." Jacobi thereafter sent a letter dated June 9, 1987 to Heit suggesting that they take action concerning this motion picture. Heit says that he was unaware of *Return* prior to being contacted by Jacobi. He also indicated that he could find no information suggesting that Academy had any prior knowledge of *Return*.

In a letter dated June 15, 1987, Jacobi demanded on behalf of CPII and Horizon that Unger cease and desist from any further use of the name "Return from the River Kwai" or action would be taken to protect the rights of CPII and Horizon in "Bridge on the River Kwai." Jacobi explained that CPII and Horizon believed that there were trademark and unfair competition problems with the use of the *Return* title. Further correspondence between the parties failed to result in a resolution.

Filming of *Return* commenced in February of 1988. In June of 1988, Roger Faxon, a senior executive at CPII, wrote to Tri–Star's president, David Matalon, to inquire whether Tri–Star could persuade Leisure Time to change the title of *Return* to prevent the risk of a lawsuit by Academy. Matalon, in turn, wrote Leisure Time in September of 1988 and stated that, upon the advice of outside counsel and Tri–Star's legal department, there was a substantial risk that the Spiegel

interests would prevail in a suit to enjoin the release of *Return*.

Subsequently, in October of 1988, Leisure Time offered to change the title of the motion picture to "March from the River Kwai" and to add a disclaimer stating that the film was not a sequel to *Bridge*. In a November 2, 1988 letter, Jacobi, then Senior Vice President and General Counsel of CPEI, informed Academy that this proposal provided an excellent compromise to avoid unnecessary litigation and that it was unlikely that a court would consider granting any further relief. Nevertheless, in a November 17, 1988 letter, Academy rejected the proposal and threatened to commence litigation, joining Tri–Star and Columbia as defendants, if the term "River Kwai" was used in the title of *Return*.

In light of its inability to secure Academy's consent, Tri–Star, on December 5, 1988, demanded that Leisure Time eliminate "River Kwai" from the title for the reason that Academy's threat to sue put Leisure Time in default of its obligation under the Distribution Agreement to deliver *Return* free from any claim that could impair or interfere with Tri–Star's distribution rights. Leisure Time refused to remove the words "River Kwai" from the title and threatened to sue Tri–Star if it did not distribute *Return*.

On December 27, 1988, Tri–Star filed a companion declaratory judgment action entitled *Tri–Star Pictures, Inc. v. Unger*, 88 Civ. 9129 (DNE) to establish the respective rights of Academy and Leisure Time in the titles *Bridge* and *Return* and in the words "River Kwai," as well as this declaratory judgment action to declare the termination of the Distribution Agreement. In the captioned action, Leisure Time counterclaimed against Tri–Star for breach of contract in light of Tri–Star's refusal to distribute *Return*, alleging that Academy's trademark claim did not materially affect Tri–Star's rights. Leisure Time also asserted counterclaims against Tri–Star for various unfair trade violations including restraint of trade, in violation of section 340 of New York's General Business Laws; common law interference with contract; common law unfair competition; and unfair competition in violation of section 368–d of New York's General Business Laws. It

asserted the same unfair competition claims by way of third-party complaint against CPII, CPEI and Academy as well as Horizon and the Estate of Sam Spiegel. By way of counterclaim in its third-party answer, Academy asserted claims against Leisure Time and Tri–Star for trademark infringement, in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); common law unfair competition; and dilution and injury to business reputation, in violation of section 368 of the New York General Business Law.

Tri–Star moved for summary judgment on its claim for a declaration that the contract was terminated, and Leisure Time cross-moved for summary judgment on its counterclaim for breach of contract. In an Opinion & Order reported at 749 F.Supp. 1243 (S.D.N.Y.1990), the district court granted Tri–Star's motion. The district court found that Academy's trademark claim clearly would impair or interfere with Tri–Star's distribution rights and constitute a breach of the warranty given by Leisure Time in paragraph 9(A)(2) of Exhibit A to the Distribution Agreement. 749 F.Supp. at 1253. It then concluded that, because Leisure Time could not deliver the film free of all claims against it, Tri–Star was entitled to terminate the Distribution Agreement. Leisure Time's counterclaim was dismissed accordingly.

In a later Opinion & Order, dated October 6, 1992, the district court addressed three additional motions: (1) Leisure Time's motion for reconsideration on new evidence of the summary judgment entered in favor of Tri–Star; (2) a motion by Tri–Star and the Columbia defendants for summary judgment dismissing Leisure Time's unfair competition claims; and (3) a motion by Academy and the estate of Sam Spiegel for summary judgment against Leisure Time in the companion trademark action.

The district court denied Leisure Time's motion for reconsideration on finding that the proffered evidence was not newly discovered and granted summary judgment for Tri–Star and the Columbia defendants on the remaining claims. Finally, the district court denied Academy's motion for summary judgment against Leisure Time on the companion trademark infringement claim because dis-

puted issues of material fact remained as to laches, secondary meaning and strength of the "River Kwai" mark. While denying Academy's motion, however, the district court noted that "Academy has made a strong preliminary showing that it is entitled to relief under the Lanham Act." *Id.* 1992 WL 296314, at *7, 1992 U.S.Dist. LEXIS 15232, at *20–21.

In a final judgment dated March 23, 1993, the district court granted judgment in favor of Tri–Star on its claim for declaratory judgment and in favor of Tri–Star and the Columbia defendants, dismissing the counterclaims and third-party claims asserted by Leisure Time; ordered, based on the parties' agreement, that all remaining third-party claims of Leisure Time against Academy, the Spiegel Estate and Horizon be dismissed with prejudice (with no right of appeal); and ordered that the counterclaims of Academy in the third-party answer be dismissed without prejudice to proceed with those claims in the pending trademark action. Leisure Time appeals from the portion of the final judgment granting judgment in favor of Tri–Star on its claim for declaratory relief and in favor of Tri–Star and the Columbia defendants on the counterclaims and third-party claims of unfair competition.

## DISCUSSION

Leisure Time contends that summary judgment in favor of Tri–Star should not have been granted because material issues of fact regarding the materiality of the Academy claim and Tri–Star's lack of good faith must be resolved. Leisure Time also contends that the district court failed to consider certain provisions of the Distribution Agreement and, therefore, that this Court should at least remand this proceeding to allow the district court to render factual determinations.

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party establishes its right to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1030 (2d Cir.1993). Once the moving party properly has supported its motion for

summary judgment, the non-moving party must establish a genuine issue of material fact in order to defeat the grant of summary judgment. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). We review the grant of a motion for summary judgment de novo, *see Peoples Westchester Sav. Bank v. Federal Deposit Ins. Corp.*, 961 F.2d 327, 330 (2d Cir.1992), and find that it was proper in this case.

### A. Materiality of Academy Trademark Claim

■ Leisure Time contends that the Academy claim does not materially affect Tri–Star's rights under the Distribution Agreement and, therefore, that Tri–Star is not entitled to terminate the Distribution Agreement. Two provisions of the Distribution Agreement are relevant here. Paragraph 9(A)(2) of Exhibit A provides that "[t]here are, and will be, no claims ... of any nature in or to the Picture or any part thereof which can or will impair or interfere with the rights of Tri–Star hereunder." Paragraph 7(A)(2) of Exhibit A provides that the right to terminate the contract would occur upon "any breach or default by [Leisure Time] of any *representation*, warranty or other term or provision of this Agreement, which *materially* affects Tri–Star's rights hereunder." (emphasis added). In determining whether Tri–Star is entitled to exercise the right of termination under paragraph 7(A)(2), our inquiry is limited to whether the Academy claim constitutes a breach of the representation in paragraph 9(A)(2) and whether the breach materially affects Tri–Star's rights. We need not determine that the underlying trademark action will succeed in order to decide this case.

■ To prevail on a statutory or common law claim of trademark infringement, a party must establish that the symbols for which it seeks trademark protection are val-id, legally protectable marks and that another's subsequent use of a similar mark is likely to create confusion as to the origin of the product. *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 581–82 (2d Cir.1990). Titles of motion pictures and other works of artistic expression are entitled to trademark protection under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (1988 & Supp. IV 1992). *See Twin Peaks Prods., Inc. v. Publications Int'l, Ltd.*, 996 F.2d 1366, 1379 (2d Cir.1993); Alan Behr, *Film and TV Titles Prove Difficult to Protect*, Nat'l L.J., Nov. 1, 1993, at S34, S34.

The district court, in denying summary judgment to both Academy and Leisure Time on the trademark issue that now is before the district court in the companion case, noted that material issues of fact remained regarding the merits of this claim. 749 F.Supp. at 1253; 1992 WL 296314, at *6–7, 1992 U.S.Dist. LEXIS 15232, at *19–21. The district court also noted that Academy had made a strong preliminary showing for relief under the Lanham Act. The district court indicated that surveys submitted to the court in conjunction with the trademark issue demonstrated that a substantial portion of the sample population mistakenly believed that *Return* was a sequel to *Bridge*. 1992 WL 296314, at *7, 1992 U.S.Dist. LEXIS 15232, at *21. Thus, at the very least, Academy has presented a colorable claim that may have forced Tri–Star to engage in protracted litigation. The Distribution Agreement clearly was designed to protect Tri–Star from such a burden. The claim was contrary to Leisure Time's representation that there would be no claims interfering with the rights of Tri–Star.

Notwithstanding the merits of the Academy claim, Tri–Star cannot exercise the termination clause of the Distribution Agreement if the claim does not materially affect its rights thereunder. Distrib.Agree., Exhibit A, ¶ 7(A)(2). The possibility of liability for money damages alone does not represent a threat because Leisure Time agreed to indemnify Tri–Star against such liability. Paragraph 9(B) of Exhibit A provides:

> [Leisure Time] shall indemnify and hold harmless Tri–Star and the corporations comprising Tri–Star, and its and their offi-

cers, directors and employees, from and against any and all liability, damages, costs and expenses (including reasonable attorneys' fees and court costs) which any of them may sustain or suffer by reason of .. breach of any of the covenants, agreements, representations or warranties of [Leisure Time] contained in this Agreement. In addition to any and all rights and remedies granted to Tri–Star hereunder, Tri–Star shall have the right to set off against any monies payable to [Leisure Time] hereunder the amount of any such liability, damages, costs and expenses.

Additionally, Leisure Time, in accordance with paragraph 6(A) of Exhibit A, obtained E & O insurance for *Return* on behalf of itself and Tri–Star. This insurance was for $1,000,000 per claim, with an aggregate of $3,000,000, amounts which were specified in the Distribution Agreement. Given the broad indemnity provision and E & O insurance, we conclude that the threat of money damages posed by the Academy claim does not materially affect Tri–Star's rights under the Distribution Agreement.

If Academy were to obtain a preliminary injunction enjoining the distribution of *Return*, however, there can be little dispute that the injunction would materially affect Tri–Star's rights. Leisure Time acknowledges as much in its answer, submitted in response to the complaint in this action, wherein it conceded that "any restraint against release of Leisure Time's motion picture would be damaging to [Tri–Star]." The Distribution Agreement obligates Tri–Star to contract with exhibitors and to otherwise distribute and market *Return*. An injunction would impede the performance of that obligation and adversely affect Tri–Star's relationship with those parties with which it necessarily would contract for the distribution and marketing of the motion picture. Leisure Time nevertheless argues that the Academy claim does not materially affect Tri–Star's rights because the doctrine of laches forecloses Academy from obtaining injunctive relief.

■ Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an ac-

tion. *Stone v. Williams,* 873 F.2d 620, 623 (2d Cir.), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989), *vacated on other grounds,* 891 F.2d 401 (2d Cir.1989), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3215, 110 L.Ed.2d 662 (1990). To prove laches and bar the grant of injunctive relief in the companion trademark action, Leisure Time would need to show that Academy had knowledge of Leisure Time's planned use of the trademark, that Academy inexcusably delayed in taking action and that Leisure Time would be prejudiced if Academy belatedly asserted its rights. *Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037, 1040 (2d Cir.1980); *see New Era Publications Int'l v. Henry Holt & Co.,* 873 F.2d 576, 584–85 (2d Cir. 1989) (equitable doctrine of laches barred plaintiff from enjoining publication of author's biography when there was severe prejudice and unconscionable delay in seeking injunctive relief), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990). The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case. *Stone,* 873 F.2d at 623–24. The inquiry is a factual one. The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court. *Robins Island Preservation Fund, Inc. v. Southold Dev. Corp.,* 959 F.2d 409, 423 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 603, 121 L.Ed.2d 539 (1992).

The record is not so clear that we can conclude with certainty that the injunctive relief sought by Academy against the release and distribution of *Return* is foreclosed by laches. There are questions of fact as to whether Academy received notice in 1978 or 1987 that a motion picture entitled *Return* would be filmed; whether Academy inexcusably delayed in asserting its trademark claim against Leisure Time between 1987, when Academy acknowledges notice, and 1989, when the trademark action was commenced; and whether Leisure Time was prejudiced by this delay. The district court noted that there are disputed issues of material fact as to whether Academy is guilty of laches. 1992 WL 296314, at *7, 1992 U.S.Dist. LEXIS 15232, at *21. Since Leisure Time is unable

to demonstrate, as a matter of law, that Academy is foreclosed from obtaining the injunctive relief it seeks, the Academy claim materially affects Tri–Star's rights and obligations under the Distribution Agreement and, therefore, Tri–Star is entitled to exercise its right of termination.

### B. Issue of Good Faith/Fair Dealing

■ Leisure Time also contends that, even if the Academy claim materially affects Tri–Star's rights, Tri–Star is not entitled to terminate the Distribution Agreement because it was obligated to compel its sister company, CPII, to license the use of *Bridge* for *Return* under both its duty to exercise good faith business judgment pursuant to paragraph 8(b) of the Distribution Agreement and under the doctrine of good faith and fair dealing inherent in contracts pursuant to California law, which applies in this case pursuant to a choice of law clause in the Distribution Agreement. *See Foley v. Interactive Data Corp.,* 47 Cal.3d 654, 254 Cal.Rptr. 211, 227, 765 P.2d 373, 389 (1988). Leisure Time further argues that Tri–Star's lack of good faith also is evidenced by Tri–Star's refusal to proceed with distribution only one month after attempting to persuade Academy to accept the title change and disclaimer as a compromise. We disagree.

Tri–Star has no duty or obligation to compel its sister company, CPII, to provide a license for Leisure Time. CPII, not Tri–Star, owns the rights to *Bridge.* Despite Leisure Time's contention that Tri–Star can compel the issuance of a license, it fails to offer any concrete evidence that Tri–Star has a right to dictate the licensing of any title owned by CPII. *Cf. Mellon Bank, N.A. v. Metro Communications, Inc.,* 945 F.2d 635, 643 (3d Cir.1991) (*cert. denied, Committee of Unsecured Creditors v. Mellon Bank, N.A.,* — U.S. —, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992) related corporations entitled to presumption of separateness); *Crown Cent. Petroleum Corp. v. Cosmopolitan Shipping Co.,* 602 F.2d 474, 476 (2d Cir.1979) (absent a showing of fraud or bad faith, related corporations entitled to presumption of separateness). Moreover, we do not believe that CPII has an unrestricted right to grant a license in derogation of Academy's interest. *See Cortner v. Israel,* 732 F.2d 267, 272 (2d Cir.1984) (copyright holder may be liable for breach of implied obligation not to use title in a way that deprives party of right to royalties); *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.,* 30 N.Y.2d 34, 330 N.Y.S.2d 329, 334, 281 N.E.2d 142, 145 (N.Y.) (activity of publisher that harms author and lessens royalties may justify breach of contract action), *cert. denied,* 409 U.S. 875, 93 S.Ct. 125, 34 L.Ed.2d 128 (1972). Indeed, in rejecting the proffered compromise set forth in the November 2, 1988 letter from Jacobi, Academy threatened to sue and to join Tri–Star and Columbia as defendants if *Return* was released with the words "River Kwai" in the title. We conclude that Tri–Star merely exercised its contractual right to terminate the Distribution Agreement when confronted by an Academy claim which materially threatened its rights under the Agreement. Tri–Star bargained for the right to protect itself from having to litigate a colorable claim and, in exercising that right, it cannot be said to have acted in bad faith in this case.

### CONCLUSION

As conceded by Leisure Time, the counterclaims that it asserted against Tri–Star for breach of contract and unfair competition, as well as its third-party claims against the Columbia defendants, are dependent upon a finding of contractual breach on the part of Tri–Star. Since we have determined that Tri–Star properly exercised its right to terminate the contract, those counterclaims and third-party claims properly were dismissed. Accordingly, the judgment of the district court is affirmed in all respects.